# IN THE SUPREME COURT OF CALIFORNIA

ANOTHER PLANET ENTERTAINMENT, LLC,
Plaintiff and Appellant,

v.

VIGILANT INSURANCE COMPANY,
Defendant and Respondent.

S277893

Ninth Circuit
21-16093

Northern District of California
3:20-cv-07476-VC

---

May 23, 2024

Chief Justice Guerrero authored the opinion of the Court, in which Justices Corrigan, Liu, Kruger, Groban, Jenkins, and Evans concurred.

---

ANOTHER PLANET ENTERTAINMENT, LLC v.
VIGILANT INS. CO.
S277893


Opinion of the Court by Guerrero, C. J.


At the outset of the COVID-19 pandemic, and for some time thereafter, many businesses were forced to curtail their operations or close entirely. Some of these businesses sought coverage for their financial losses from their commercial property insurers under conventional first-party "all risk" or "open peril" insurance policies. These policies generally predicate coverage on "direct physical loss or damage" to the insured property or nearby property. State and federal courts across the country have considered whether conventional property insurance policies provide coverage for pandemic-related losses, including whether the COVID-19 virus satisfies the threshold requirement of direct physical loss or damage to property. California courts have reached different conclusions on this issue, and in this case we accepted a request by the United States Court of Appeals for the Ninth Circuit to clarify California law in this area. (Cal. Rules of Court, rule 8.548.)

The Ninth Circuit posed the following question: "Can the actual or potential presence of the COVID-19 virus on an insured's premises constitute 'direct physical loss or damage to property' for purposes of coverage under a commercial property insurance policy?" (*Another Planet Entertainment, LLC v. Vigilant Insurance Co.* (2022) 56 F.4th 730, 734 (*Another Planet*).)

The question arises in the context of a civil lawsuit filed by Another Planet Entertainment, LLC (Another Planet) against its property insurer, Vigilant Insurance Company (Vigilant). Another Planet operates venues for live entertainment. It suffered pandemic-related business losses when its venues closed, and Vigilant denied Another Planet's subsequent claim for insurance coverage. Another Planet filed suit in federal district court, alleging that the actual or potential presence of the COVID-19 virus at its venues or nearby properties caused direct physical loss or damage to property and triggered coverage under its insurance policy. The district court granted Vigilant's motion to dismiss for failure to state a claim, and Another Planet appealed. According to the Ninth Circuit, the issue on appeal "is whether [Another Planet's] allegations, if taken as true, were sufficient to show 'direct physical loss or damage to property' as defined by California law." (*Another Planet*, *supra*, 56 F.4th at p. 731.) Because the Ninth Circuit concluded that resolution of this question of California law could determine the outcome of the case pending before it, the Ninth Circuit certified the question to this court.

We conclude, consistent with the vast majority of courts nationwide, that allegations of the actual or potential presence of COVID-19 on an insured's premises do not, without more, establish direct physical loss or damage to property within the meaning of a commercial property insurance policy. Under California law, direct physical loss or damage to property requires a distinct, demonstrable, physical alteration to property. The physical alteration need not be visible to the naked eye, nor must it be structural, but it must result in some injury to or impairment of the property as property.

The factual allegations of Another Planet's complaint, which we accept as true for purposes of this proceeding, do not satisfy this standard. While Another Planet alleges that the COVID-19 virus alters property by bonding or interacting with it on a microscopic level, Another Planet does not allege that any such alteration results in injury to or impairment of the property itself. Its relevant physical characteristics are unaffected by the presence of the COVID-19 virus.

Another Planet focuses on the virus's risk to humans, and it alleges that the actual or potential presence of the virus rendered its properties unfit for their intended use. But the mere fact that a property cannot be used as intended is insufficient on its own to establish direct physical loss to property. Similarly, the fact that a business was forced to curtail its operations, in whole or in part, based on pandemic-related government public health orders is likewise insufficient. The restrictions of a government public health order are legal, i.e., intangible, in nature. They do not constitute direct physical loss or damage to property.

In rare situations, a property may suffer direct physical loss where it is not damaged in a conventional sense, including where a chemical contaminant or noxious odor infiltrates the property and renders it effectively unusable or uninhabitable. In such a case, the contaminant or odor may cause direct physical loss, but only where the source of the property's unusability or uninhabitability is sufficiently connected to the property itself. This situation may arise when the effect of the contaminant or odor is so lasting and persistent that the risk of harm is inextricably linked or connected to the property. Another Planet's allegations regarding the effect of the COVID-19 virus on property fail to meet this standard as well.

While we conclude Another Planet's allegations are insufficient, and it appears that such allegations represent the most common allegations in support of pandemic-related property insurance coverage, we cannot and do not in this proceeding determine that the COVID-19 virus can *never* cause direct physical loss or damage to property. Our contemplation of the virus and the affected property is necessarily limited by Another Planet's factual allegations. Nonetheless, given the prevalence of similar circumstances, we answer the Ninth Circuit's question as follows: No, the actual or potential presence of COVID-19 on an insured's premises generally does not constitute direct physical loss or damage to property within the meaning of a commercial property insurance policy under California law.

## I. FACTUAL AND PROCEDURAL BACKGROUND

"Because this matter is presently on appeal from a dismissal under Federal Rules of Civil Procedure, rule 12(b)(6) (28 U.S.C.), we recite the facts as alleged in the operative complaint. [Citation.] The question at this stage of the litigation is the legal sufficiency of the pleadings. We treat the factual allegations as true for purposes of addressing the certified question[]." (*Kuciemba v. Victory Woodworks, Inc.* (2023) 14 Cal.5th 993, 1004.)

Another Planet is an independent operator and promoter of live entertainment (including concerts, festivals, and events) at several venues in California and Nevada. It purchased a commercial property insurance policy from Vigilant. The policy provided for two main categories of coverage: (1) building and personal property coverage and (2) business income and extra expense coverage.

Under the first category, Vigilant promised, "We will pay for direct physical loss or damage to [a building or personal property] caused by or resulting from a peril not otherwise excluded . . . ." It also promised, "We will pay the reasonable and necessary costs you incur to protect [the building and personal property] at the premises shown in the Declarations from imminent direct physical loss or damage caused by or resulting from a peril not otherwise excluded . . . ." The policy defined "[b]uilding" as "a structure," "building components," "completed additions," and "alterations and repairs to the structure." It excluded "land, water or air, either inside or outside of a structure."

Under the second category of coverage, Vigilant promised, "We will pay for the actual: [¶] business income loss you incur due to the actual impairment of your operations; and [¶] extra expense you incur due to the actual or potential impairment of your operations, [¶] during the period of restoration . . . . [¶] This actual or potential impairment of operations must be caused by or result from direct physical loss or damage by a covered peril to property, unless otherwise stated."

The policy defined the "[p]eriod of restoration" as "the period of time that, for business income, begins: [¶] A. immediately after the time of direct physical loss or damage by a covered peril to property; or [¶] B. on the date operations would have begun if the direct physical loss or damage had not occurred, when loss or damage [to new buildings, alterations, or personal property] delays the start of operations . . . ." Similarly, for extra expense, the period of restoration begins "immediately after the time of direct physical loss or damage by a covered peril to property." The policy provided that the period of restoration "will continue until your operations are restored,

5

with reasonable speed, to the level which would generate the business income amount that would have existed if no direct physical loss or damage occurred, including the time required to:  [¶] . . . repair or replace the property."  The outside limit on the length of the period of restoration was "the applicable number of days shown as Extended Period in the Declaration, beginning on the date that," as relevant here, "the lost or damaged property is actually repaired or replaced and your operations are restored."

Within this second category, the policy also covered lost income and extra expenses incurred as a result of certain governmental actions.  Vigilant promised, "We will pay for the actual:  [business income loss or extra expense] you incur due to the actual impairment of your operations, directly caused by the prohibition of access to [your premises or a dependent business premises] by a civil authority.  [¶]  This prohibition of access by a civil authority must be the direct result of direct physical loss or damage to property away from such premises or such dependent business premises by a covered peril, provided such property is within [either one mile or the miles specified in the policy's declaration] from such premises or dependent business premises, whichever is greater."

In early 2020, the COVID-19 virus became a widespread concern in the United States.  The virus — technically SARS-CoV-2, which causes the COVID-19 respiratory illness — is highly contagious and potentially fatal.  The virus is a physical substance.  It primarily spreads from person to person via airborne respiratory droplets or aerosols containing the virus.

According to Another Planet, indoor and outdoor air is normally composed of various gaseous elements and particles.

The introduction of respiratory droplets or aerosols containing the COVID-19 virus changes the composition of the affected air through the addition of such droplets or aerosols. Respiratory droplets with the COVID-19 virus can also settle on the surfaces of real and personal property. The droplets attach to these surfaces and, in Another Planet's view, physically alter them. The virus can remain in the air or on surfaces for hours or days. Although it is not a primary mode of transmission, a person can contract COVID-19 by touching a surface on which the COVID-19 virus has been deposited. Another Planet alleges that the presence of the droplets containing the COVID-19 virus "requires steps to be taken to minimize their spread, such as physical distancing, regular disinfection, air filtration, and further physical alterations, such as installation of physical barriers restricting the movement of the aerosolized droplets." Another Planet asserts there is evidence that remedial measures "cannot be assured to eliminate or exclude" the COVID-19 virus from its premises.

Another Planet further alleges that the COVID-19 virus was present at its properties, "or would have been present but for its efforts to reduce, prevent, or otherwise mitigate its presence on its properties." It maintains that the presence or potential presence of the COVID-19 virus caused a "distinct, demonstrable, physical alteration to property," and its presence or potential presence prevented or impaired the use of Another Planet's property. Another Planet's properties were "unsafe and unusable." Given the danger of the COVID-19 virus, "no 'rational persons would be content' to be in a venue likely to cause them to contract COVID-19." Another Planet alleged the only way to prevent the presence of the COVID-19 virus was to close its venues completely.

State and local authorities recognized the public health risk of the COVID-19 virus and imposed restrictions on individuals and businesses, including Another Planet. Public health orders "prohibited or limited the use and operations of Another Planet's insured locations." Another Planet was forced to cancel all events scheduled for its venues and could not use its insured locations for their intended purpose. It alleges it suffered losses in excess of $20 million.

In May 2020, Another Planet submitted an insurance claim to Vigilant for direct physical loss or damage to its properties and consequent economic losses. Vigilant denied coverage. It maintained that Another Planet had not shown "physical loss or damage that would implicate coverage in this matter."

Another Planet filed a complaint and, later, a first amended complaint against Vigilant in federal district court. It alleged causes of action for breach of contract, tortious breach of the implied covenant of good faith and fair dealing, and various forms of fraud. It also sought declaratory relief. Vigilant moved to dismiss the first amended complaint for failure to allege facts sufficient to state a claim upon which relief can be granted. (Fed. Rules Civ.Proc., rule 12(b)(6), 28 U.S.C.) Vigilant primarily argued that Another Planet had not alleged direct physical loss or damage to property, which was required to trigger coverage under any theory advanced by Another Planet.

The district court granted Vigilant's motion to dismiss. It found that "Another Planet does not have a claim for loss of business income because the closure orders [by state and local public health authorities] — and not [the] virus's alleged presence at Another Planet's facilities — caused it to shut

down." The district court also rejected Another Planet's attempt to tie the closure orders to direct physical loss or damage to property. It explained, "[T]hose closure orders were not passed as a direct result of property damage at nearby properties." There was no suggestion that the "closure orders were passed 'as a direct result' of the virus having caused actual property damage at buildings close to Another Planet's facilities (or anyone else's facilities for that matter)." (Fn. omitted.)

Another Planet appealed. After briefing and oral argument, the Ninth Circuit issued a written order certifying a question of law to this court. (*Another Planet, supra*, 56 F.4th 730.) The order identified "conflicting decisions" of the lower California courts "regarding whether allegations like Another Planet's suffice to state a viable claim for 'direct physical loss or damage to property.' " (*Id.* at p. 733.) The order stated that the resolution of this conflict was potentially dispositive of Another Planet's appeal "because if the allegation of the presence or potential presence of the COVID-19 virus is sufficient to show 'direct physical loss or damage to property,' the district court erred in dismissing Another Planet's complaint for failure to state a claim, and we would remand to the district court for further proceedings. Alternatively, if the allegation is not sufficient, we would affirm the district court." (*Id.* at p. 734.) As noted, we agreed to answer the Ninth Circuit's question, and these proceedings followed.

## II. DISCUSSION

### A. General Principles of Property Insurance

As a leading treatise explains, "The fundamental principle of a property insurance contract is to indemnify the owner against loss; that is to place the owner in the same position in

9

which he or she would have been had no accident occurred." (10A Couch on Insurance (3d ed. 2005) § 148:1.) " 'Property insurance . . . is an agreement, a contract, in which the insurer agrees to indemnify the insured in the event that the insured property suffers a covered loss. Coverage, in turn, is commonly provided by reference to causation, e.g., "loss caused by . . ." certain enumerated perils.' " (*Garvey v. State Farm Fire & Casualty Co.* (1989) 48 Cal.3d 395, 406 (*Garvey*).) Alternatively, the coverage grant may cover all perils " 'not specifically excepted or excluded (as in an "all risks" policy).' " (*Ibid.*) " 'The term "perils" in traditional property insurance parlance refers to fortuitous, active, physical forces such as lightning, wind, and explosion, which bring about the loss.' " (*Ibid.*)

"Historically, property insurance grew out of the insurance against the risk of fire which became available for ships, buildings, and some commercial property at a time when most of the structures in use were made wholly or primarily of wood." (10A Couch on Insurance, *supra*, § 148:1.) "On this side of the Atlantic, fire insurance first developed in the middle of the eighteenth century. . . . [T]his was insurance against only one cause of loss, or peril — fire. Over time other insured perils, such as wind and hail, were added. These insured perils were each specified in the insurance policy. For this reason, such insurance came to be known as 'specified-risk' coverage. It insured property against the risk of damage or destruction resulting from specified causes of loss." (Abraham, *Peril & Fortuity in Property & Liability Insurance* (2001) 36 Tort Trial & Ins. Prac. L.J. 777, 782–783, fn. omitted.) By contrast, marine insurance developed "standardized forms that insured an ocean-going vessel and its cargo against 'perils of the high seas.' Whereas the development of fire insurance for property on land

10

focused on the danger presented by a specified cause of loss, marine insurance typically provided coverage for all risks associated with a particular shipment or voyage." (5 New Appleman on Insurance Law Library Edition (2023) § 41.01[1], fn. omitted.) "[B]y the middle of the twentieth century, insurers adopted the marine insurance approach by offering all-risk commercial and homeowners' property insurance. The operative phrase in such policies is contained in the section labeled 'Perils Insured Against,' and provides coverage against the risk of 'direct physical loss' to covered property." (Abraham, at p. 783, fn. omitted.)

"As with any insurance, property insurance coverage is 'triggered' by some threshold concept of injury to the insured property. Under narrow coverages like theft, the theft is itself the trigger. Under most coverages, however, the policy specifically ties the insurer's liability to the covered peril having some specific effect on the property. In modern policies, especially of the all-risk type, this trigger is frequently 'physical loss or damage' . . . ." (10A Couch on Insurance, *supra*, § 148:46.)

This court has not previously interpreted the phrase "physical loss or damage" (or "direct physical loss or damage") as the phrase is commonly used in property insurance policies. Even prior to the COVID-19 pandemic, however, the Courts of Appeal decided several cases that turned on the meaning of this phrase. Without at this point endorsing their reasoning, we summarize the most pertinent of these opinions to provide context for the parties' contentions and our discussion below.

In one early case, the Court of Appeal considered a property insurance policy that "insured plaintiffs against all

11

risks of physical loss of and damage to their dwelling." (*Hughes v. Potomac Ins. Co.* (1962) 199 Cal.App.2d 239, 242 (*Hughes*).) The plaintiffs owned a home adjacent to a creek, and one night "the earth to the rear of and partially underlying plaintiffs' house slid into the creek, leaving their home standing on the edge of and partially overhanging a newly formed 30-foot cliff. This landslide resulted in the loss to plaintiffs of a block of earth 30 feet wide and 100 feet long, and it deprived them of subjacent and lateral support essential to the stability of their house." (*Id.* at p. 243.) The insurance company argued it was not responsible for the cost of shoring up the hillside because "its policy insured the building structure and foundations of respondents' house, but did not insure the soil or land underneath the building." (*Id.* at p. 245.)

The *Hughes* court disagreed: "To accept [the insurer's] interpretation of its policy would be to conclude that a building which has been overturned or which has been placed in such a position as to overhang a steep cliff has not been 'damaged' so long as its paint remains intact and its walls still adhere to one another. Despite the fact that a 'dwelling building' might be rendered completely useless to its owners, [the insurer] would deny that any loss or damage had occurred unless some tangible injury to the physical structure itself could be detected. Common sense requires that a policy should not be so interpreted in the absence of a provision specifically limiting coverage in this manner. [Plaintiffs] correctly point out that a 'dwelling' or 'dwelling building' connotes a place fit for occupancy, a safe place in which to dwell or live. It goes without question that [plaintiffs'] 'dwelling building' suffered real and severe damage when the soil beneath it slid away and left it overhanging a 30-foot cliff. Until such damage was repaired and

the land beneath the building stabilized, the structure could scarcely be considered a 'dwelling building' in the sense that rational persons would be content to reside there." (*Hughes*, *supra*, 199 Cal.App.2d at pp. 248–249.)

Several decades later, a different Court of Appeal confronted direct physical loss or damage more directly. (*Ward General Ins. Services, Inc. v. Employers Fire Ins. Co.* (2003) 114 Cal.App.4th 548 (*Ward*).) Due to human error — "an operator inadvertently pressed the 'delete' key on the keyboard" — the plaintiff suffered a computer " 'crash' " that resulted in the loss of electronically stored data. (*Id.* at p. 550 & fn. 3.) "Plaintiff incurred extra expenses restoring its data, and also suffered the loss of business income because of the disruption." (*Id.* at p. 550.) The plaintiff sought insurance coverage on the theory that its lost data constituted a " 'direct physical loss.' " (*Ibid.*) The parties did not submit "any evidence suggesting that the phrase 'direct physical loss' has some technical meaning or special meaning given by usage." (*Id.* at p. 556.) The court therefore construed the terms in accordance with their ordinary meanings: "The word 'physical' is defined, inter alia, as 'having material existence' and 'perceptible esp. through the senses and subject to the laws of nature.' (Merriam-Webster's Collegiate Dict. (10th ed. 1993) p. 875.) 'MATERIAL implies formation out of tangible matter.' (*Id.* at p. 715.) 'Tangible' means, inter alia, 'capable of being perceived esp. by the sense of touch.' (*Id.* at p. 1200.) Thus, relying on the ordinary and popular sense of the words, we say with confidence that the loss of plaintiff's database does not qualify as a 'direct physical loss,' *unless* the database has a material existence, formed out of tangible matter, and is perceptible to the sense of touch." (*Ward*, at p. 556.)

Because a database consists of organized information, and therefore "the loss of a database is the loss of organized information," the *Ward* court held that the loss of the database was not a direct physical loss. (*Ward*, *supra*, 114 Cal.App.4th at p. 556.) "Plaintiff did not lose the tangible material of the storage medium. Rather, plaintiff lost the stored *information.* The sequence of ones and zeros can be altered, rearranged, or erased, without losing or damaging the tangible material of the storage medium." (*Ibid.*)

This requirement of tangible or physical harm took on similar importance in *Doyle v. Fireman's Fund Ins. Co.* (2018) 21 Cal.App.5th 33 (*Doyle*). In that case, a wine collector purchased "close to $18 million of purportedly rare, vintage wine," but it turned out to be counterfeit. (*Id.* at p. 36.) The collector's insurance policy covered " 'direct and accidental loss or damage to covered property.' " (*Id.* at p. 38.) The court proceeded from the premise that " 'property insurance is insurance of *property*. While in the modern setting "just about any type of property" may be insured, the insured item must nonetheless be property.' " (*Ibid.*) " 'Given this premise, the threshold requirement for recovery under a contract of property insurance is that the insured property has sustained physical loss or damage. [Citation.] "The requirement that the loss be 'physical,' given the ordinary definition of that term is widely held to exclude alleged losses that are intangible or incorporeal, and, thereby, to preclude any claim against the property insurer where the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property." ' " (*Ibid.*) The same principle applied even though the collector's insurance policy did not use the word "physical" in its grant of coverage: "[G]iven the fundamental

nature of property insurance, the policy [the collector] purchased only insured him against potential harms to the wine itself, such as fire, theft, or abnormal spoilage; [the collector] did not insure himself against any potential financial losses." (*Id.* at p. 39.) Thus, "because nothing happened *to the covered property* (i.e., the wine that [the collector] purchased and insured)," the property did not suffer any loss and the insurer properly denied coverage. (*Id.* at p. 38.)

In *MRI Healthcare Center of Glendale, Inc. v. State Farm General Ins. Co.* (2010) 187 Cal.App.4th 766 (*MRI Healthcare*), the Court of Appeal discussed some of these same concepts. A plaintiff purchased an insurance policy providing coverage for " 'accidental direct physical loss to business personal property,' " as well as lost business income as a result of "accidental direct physical loss to property . . . caused by an insured loss." (*Id.* at p. 771, italics omitted.) The plaintiff, a healthcare provider, was required to "demagnetize[]" or " 'ramp[] down' " its magnetic resonance imaging (MRI) machine in order to facilitate repairs to the roof of the building in which it was housed. (*Id.* at p. 770.) "Once the machine was ramped down, it failed to ramp back up. This failure purportedly constituted 'damage' to the MRI machine and resulted in loss of business income to [the plaintiff]." (*Ibid.*)

To determine coverage, the *MRI Healthcare* court looked to general principles described in the Couch treatise: "In modern policies, ' "physical loss or damage" ' is typically the trigger for coverage. [Citation.] Clearly, this threshold is met when an item of tangible property has been 'physically altered' by perils such as fire or water. [Citation.] However, serious questions crop up in instances when the structure of the property itself is unchanged to the naked eye and the insured

15

claims its usefulness for its normal purposes has been destroyed or reduced. [Citation.] That the loss needs to be 'physical,' given the ordinary meaning of the term, is 'widely held to exclude alleged losses that are intangible or incorporeal, and, thereby, to preclude any claim against the property insurer when the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property.' " (*MRI Healthcare*, *supra*, 187 Cal.App.4th at pp. 778–779, quoting 10A Couch on Insurance, *supra*, § 148:46.) The court continued, "A direct physical loss 'contemplates an actual change in insured property then in a satisfactory state, occasioned by accident or other fortuitous event directly upon the property causing it to become unsatisfactory for future use or requiring that repairs be made to make it so.' " (*MRI Healthcare*, at p. 779, quoting *AFLAC Inc. v. Chubb & Sons, Inc.* (Ga.Ct.App. 2003) 581 S.E.2d 317, 319.)

In the court's view, "there was no 'distinct, demonstrable [or] physical alteration' of the MRI machine." (*MRI Healthcare*, *supra*, 187 Cal.App.4th at p. 779.) "The failure of the MRI machine to satisfactorily 'ramp up' emanated from the inherent nature of the machine itself rather than actual physical 'damage.' As [the insurer] suggests, the MRI machine was not 'damaged' in the ordinary meaning of the word. In effect, the machine was turned off and could not be turned back on. This does not constitute a compensable 'direct physical loss' under the policy." (*Id.* at p. 780.) "For there to be a 'loss' within the meaning of the policy, some *external force* must have acted upon the insured property to cause a *physical change* in the condition of the property, i.e., it must have been 'damaged' within the common understanding of that term." (*Ibid.*) The plaintiff "failed to show any 'physical loss' occurred to the MRI machine"

and therefore could not recover under its insurance policy. (*Ibid.*)

## B. The Conflict Underlying the Certified Question

Against this backdrop, California courts confronted insurance claims arising from the COVID-19 pandemic. In its certification order, the Ninth Circuit identified a split in the California Courts of Appeal regarding the prospect for insurance coverage for pandemic-related losses. (*Another Planet*, *supra*, 56 F.4th at pp. 733–734.) *United Talent Agency v. Vigilant Ins. Co.* (2022) 77 Cal.App.5th 821 (*United Talent*) held, as a matter of law, that "the presence or potential presence of the [COVID-19] virus does not constitute direct physical damage or loss." (*Id.* at p. 838.) By contrast, *Marina Pacific Hotel & Suites, LLC v. Fireman's Fund Ins. Co.* (2022) 81 Cal.App.5th 96 (*Marina Pacific*) held that a plaintiff had sufficiently alleged direct physical loss or damage based on the presence of the COVID-19 virus. (*Id.* at pp. 108–109.) We examine each opinion in greater detail below.

In *United Talent*, the plaintiff was a large talent agency representing various professionals in the entertainment industry. (*United Talent*, *supra*, 77 Cal.App.5th at p. 824.) It purchased property insurance from Vigilant, in a form substantially similar to Another Planet's policy. (*Id.* at pp. 824–825.) At the outset of the COVID-19 pandemic, government closure orders impaired the talent agency's ability to use its insured locations. (*Id.* at p. 826.) The orders also caused the cancellation of live events and motion picture and television productions. (*Ibid.*) The talent agency suffered lost profits, lost commissions, and lost business opportunities in excess of $150 million. (*Id.* at p. 825.) Vigilant denied the talent agency's

insurance claim, and the trial court sustained Vigilant's demurrer to the talent agency's subsequent complaint. (*Id.* at pp. 826, 828.)

On appeal, the talent agency offered "two theories for why its losses were covered under the business expense provisions. First, [the talent agency] contend[ed] that the 'danger posed by' the virus, which gave rise to the closure orders and other restrictions, caused 'physical loss' because it 'limited [the agency's] use of and operations at its insured locations,' including dependent business premises, such as concert venues, thus 'rendering them unusable for their intended purposes.' Second, [the talent agency] assert[ed] that the virus itself in or around [the agency's] insured locations caused 'physical damage.'" (*United Talent, supra,* 77 Cal.App.5th at pp. 829–830.)

The *United Talent* court relied on *MRI Healthcare, supra,* 187 Cal.App.4th 766, and an earlier COVID-19 insurance opinion in *Inns-by-the-Sea v. California Mutual Ins. Co.* (2021) 71 Cal.App.5th 688 (*Inns-by-the-Sea*), to discern the scope of the talent agency's insurance coverage, particularly the requirement of direct physical loss or damage. (*United Talent, supra,* 77 Cal.App.5th at p. 830.) Initially, the court noted, "In the wake of the COVID-19 pandemic, many insureds have asserted arguments similar to [the agency's], and the majority of courts have rejected them. It is now widely established that temporary loss of *use* of a property due to pandemic-related closure orders, without more, does not constitute direct physical loss or damage." (*Id.* at pp. 830–831.) In that situation, an insured "'cannot reasonably allege that the presence of the COVID-19 virus on its premises is what *caused* the premises to be uninhabitable or unsuitable for their intended purpose.'"

(*Id.* at p. 831.) "[E]ven if [the insured] had eradicated the virus by thoroughly sterilizing its properties, '[the insured] would *still* have continued to incur a suspension of operations because the Orders would *still* have been in effect and the normal functioning of society *still* would have been curtailed.'" (*Id.* at p. 832.) The loss alleged by the talent agency "'was not a physical deprivation of property, but rather an interruption in business operations.'" (*Id.* at p. 833.) The "'mere loss of use of physical property to generate business income, without any other physical impact on the property, does not give rise to coverage for direct physical loss.'" (*Id.* at p. 834.)[1]

The *United Talent* court next confronted the talent agency's alternative argument, that "the physical presence of the virus on [its] insured premises constituted 'physical damage.'" (*United Talent, supra,* 77 Cal.App.5th at p. 834.) The agency contended its allegations were "akin to cases that 'have recognized that "direct physical loss or damage to property" occurs' in the presence of contaminants such as bacteria, smoke, asbestos, fumes, or mold." (*Ibid.*) The court disagreed, identifying numerous cases from other jurisdictions that had rejected similar arguments. (*Id.* at pp. 835–836 & fn. 10.) It quoted a federal appellate court's observation that, "'[w]hile the impact of the virus on the world . . . can hardly be overstated, its impact on physical property is inconsequential: deadly or not, it may be wiped off surfaces using ordinary

---

[1] Shortly before *United Talent*, the court in *Musso & Frank Grill Co., Inc. v. Mitsui Sumitomo Ins. USA, Inc.* (2022) 77 Cal.App.5th 753, 756, 759 also followed *Inns-by-the-Sea* and held that government closure orders did not trigger coverage for pandemic-related losses. (See *United Talent, supra,* 77 Cal.App.5th at p. 831, fn. 7.)

cleaning materials, and it disintegrates on its own in a matter of days.' " (*Id.* at p. 835.)  The *United Talent* court also repeated the following hypothetical, originally offered by a federal district court:  " 'If, for example, a sick person walked into one of Plaintiffs' restaurants and left behind COVID-19 particulates on a countertop, it would strain credulity to say that the countertop was damaged or physically altered as a result.' " (*Ibid.*)  The *United Talent* court reasoned that "the virus exists worldwide wherever infected people are present, it can be cleaned from surfaces through general disinfection measures, and transmission may be reduced or rendered less harmful through practices unrelated to the property, such as social distancing, vaccination, and the use of masks.  Thus, the presence of the virus does not render a property useless or uninhabitable, even though it may affect how people interact with and within a particular space." (*Id.* at p. 838.)  Thus, the court concluded that the talent agency "has not established that the presence of the virus constitutes physical damage to insured property." (*Id.* at p. 840.)

Several months later, the *Marina Pacific* court disagreed. (*Marina Pacific*, *supra*, 81 Cal.App.5th at pp. 111–112.)  The plaintiffs in *Marina Pacific* were the owners of a hotel and adjacent restaurant who alleged that "the COVID-19 virus was present on, and had physically transformed, portions of [their] insured properties," thus causing direct physical loss or damage and triggering coverage for their pandemic-related economic losses. (*Id.* at p. 99.)  In large part, the owners' insurance policy was the same as the insurance policy obtained by Another Planet.  (*Id.* at pp. 99–100.)  But the policy also provided coverage for losses caused by a " 'communicable disease event,' " which was defined as " 'an event in which a public health

authority has ordered that a location be evacuated, decontaminated, or disinfected due to the outbreak of a communicable disease at such location.' " (*Id.* at p. 100, boldface omitted.) The insurer promised to pay " 'for direct physical loss or damage' to insured property 'caused by or resulting from a covered communicable disease event,' including costs necessary to repair or rebuild insured property damaged or destroyed by the communicable disease and to '[m]itigate, contain, remediate, treat, clean, detoxify, disinfect, neutralize, cleanup, remove, dispose of, test for, monitor and assess the effects [of] the communicable disease.' In addition, business interruption coverage was provided for suspension of operations during a period of restoration, provided the suspension was 'due to direct physical loss or damage to property at a location caused by or resulting from a covered communicable disease event.' " (*Ibid.*)

The *Marina Pacific* plaintiffs alleged that "the COVID-19 virus does not simply live on the surface of objects. Rather, 'it also actually bonds and/or adheres to such objects through physico-chemical reactions involving, *inter alia*, cells and surface proteins' and 'caus[es], among other things, a distinct, demonstrable or physical alteration to property.' " (*Marina Pacific*, *supra*, 81 Cal.App.5th at p. 101.) They further alleged that the virus was present on various objects at the insured properties and in the air. (*Ibid.*) Moreover, they alleged, "in response to multiple employees of [the hotel] testing positive, 'various public health authorities have ordered that [the hotel] be evacuated, decontaminated, or disinfected,' and specifically alleged one employee had been ordered by the Los Angeles County Department of Health–Environmental Health Division to 'evacuate the hotel and quarantine.' " (*Id.* at pp. 101–102.) "The physical loss or damage to property, the insureds alleged,

required the closure or suspension of operations at [the hotel and restaurant] or portions of those properties at various times and caused them to incur extra expense, adopt remedial and precautionary measures 'to attempt to restore and remediate the air and surfaces at the Insured Properties, dispose of property damaged by COVID-19 and limit operations at the Insured Properties.' " (*Id*. at p. 102.) The insurer successfully demurred on the ground that these allegations did not state a claim for coverage, and the plaintiffs appealed. (*Id*. at pp. 103–104.)

On appeal, the *Marina Pacific* court acknowledged *MRI Healthcare*'s interpretation of direct physical loss or damage as requiring " 'a "distinct, demonstrable, physical alteration" of the property.' " (*Marina Pacific, supra*, 81 Cal.App.5th at p. 107.) The court also acknowledged the plaintiffs' criticism of *MRI Healthcare*'s interpretation, but it found it unnecessary to resolve the dispute. (*Id*. at pp. 107–108.) The court held that the plaintiffs had alleged direct physical loss or damage to property even under *MRI Healthcare*'s interpretation of the phrase. (*Id*. at p. 108.) It emphasized that the plaintiffs had alleged the COVID-19 virus was present on surfaces throughout their properties, the virus "bonds to surfaces through physicochemical reactions involving cells and surface proteins, which transform the physical condition of the property," and the presence of the COVID-19 virus caused the plaintiffs to "close or suspend operations in whole or in part at various times and incur[] extra expense as they adopted measures to restore and remediate the air and surfaces at the insured properties. The [plaintiffs] specifically alleged they were required to 'dispose of property damaged by COVID-19 and limit operations at the Insured Properties.' " (*Id*. at pp. 108–109.) The presence of the

virus was therefore a "distinct, demonstrable, physical alteration of the property," which "caused a slowdown in, or cessation of, the operation of the insureds' business while the covered property was restored or remediated, thereby triggering their business interruption ('business income and extra expense') coverage." (*Id.* at p. 109.)

The *Marina Pacific* court "recognize[d] this conclusion is at odds with almost all (but not all) decisions considering whether business losses from the pandemic are covered by the business owners' first person commercial property insurance." (*Marina Pacific*, *supra*, 81 Cal.App.5th at p. 109.) It had three primary responses. First, the court noted that "the pleading rules in federal court are significantly different from those we apply when evaluating a trial court order sustaining a demurrer." (*Ibid.*) California courts do not evaluate the plausibility of a plaintiff's allegations when determining whether to accept them as true. (*Ibid.*) Thus, the court accepted — " 'however improbable' " — the owners' allegation that "the COVID-19 virus alters ordinary physical surfaces transforming them into fomites[2] through physicochemical processes, making them dangerous and unusable for their intended purposes unless decontaminated." (*Id.* at p. 110.) Second, the court observed that the allegations considered by many courts were materially different because they relied on government closure orders, rather than the presence of the virus itself, as the cause of the insureds' losses. (*Id.* at pp. 110–111.)

---

[2] A fomite is " 'an object . . . that may be contaminated with infectious agents (such as bacteria or viruses) and serve in their transmission.' " (*United Talent*, *supra*, 77 Cal.App.5th at p. 826, fn. 5.)

Third, the court emphasized that the insurance policy at issue specifically included coverage for communicable diseases, in its communicable disease event coverage extension. (*Id.* at p. 112.) The language of this extension "explicitly contemplates that a communicable disease, such as a virus, can cause damage or destruction to property and that such damage constitutes direct physical loss or damage as defined in the policy." (*Ibid.*) The court explained, "Construing the policy provisions together, as we must, this language precludes the interpretation that direct physical loss or damage categorically cannot be caused by a virus." (*Ibid.*)[3]

---

[3] The court in *Amy's Kitchen, Inc. v. Fireman's Fund Ins. Co.* (2022) 83 Cal.App.5th 1062, 1068 (*Amy's Kitchen*) examined a communicable disease event coverage extension in some detail. The court noted that the extension provided coverage for " 'direct physical loss or damage' " to property, including costs incurred to " '[m]itigate, contain, remediate, treat, clean, detoxify, disinfect, neutralize, cleanup, remove, dispose of, test for, monitor, and assess the effects [of] the communicable disease.' " (*Ibid.*, boldface omitted.) It rejected the insurer's argument that such costs were not recoverable "unless the communicable disease event physically altered the property." (*Id.* at p. 1069.) The court reasoned that the communicable disease event extension was unlike the policy provisions where courts had found a physical alteration requirement. (*Ibid.*) Instead, "[o]n reading the phrase 'direct physical loss or damage' as it appears in the extension, a reasonable layperson would assume that the phrase includes costs incurred for each of the three purposes specified in" the extension itself. (*Id.* at p. 1070.) Thus, the court held, "[T]he need to clean or disinfect infected or potentially infected covered property constitutes 'direct physical loss or damage' of that property within the meaning of the policy." (*Id.* at p. 1071.) However, the plaintiff had not alleged a " 'communicable disease event' " sufficient to trigger coverage,

The *Marina Pacific* court disagreed with *United Talent* that the ability to remove the COVID-19 virus from surfaces precluded coverage. (*Marina Pacific*, *supra*, 81 Cal.App.5th at p. 111.) It stated, "Even if there had been evidence subject to proper judicial notice to establish that disinfecting repaired any alleged property damage, it would not resolve whether contaminated property had been damaged in the interim, nor would it alleviate any loss of business income or extra expenses. As the insureds argue on appeal, the duration of exposure may be relevant to the measure of policy benefits; it does not negate coverage." (*Id.* at p. 112.)

Subsequent California decisions have offered variations on the themes of *United Talent* and *Marina Pacific*. Several courts followed *United Talent* (and the earlier *Inns-by-the-Sea*) to hold that government closure orders alone are insufficient to trigger coverage because they do not cause direct physical loss or damage to property. (See *Starlight Cinemas, Inc. v. Massachusetts Bay Ins. Co.* (2023) 91 Cal.App.5th 24, 38–39 (*Starlight Cinemas*); *Tarrar Enterprises, Inc. v. Associated Indemnity Corp.* (2022) 83 Cal.App.5th 685, 687–688; *Apple Annie, LLC v. Oregon Mutual Ins. Co.* (2022) 82 Cal.App.5th 919, 923, 934 (*Apple Annie*).) Another court extended this principle. (See *Best Rest Motel, Inc. v. Sequoia Ins. Co.* (2023) 88 Cal.App.5th 696 (*Best Rest*).) It held that even if the COVID-19 virus was present at an insured property, the plaintiff must

---

i.e., " 'an event in which a public health authority has ordered that a location be evacuated, decontaminated, or disinfected due to the outbreak of a communicable disease at such location.' " (*Ibid.*) The *Amy's Kitchen* court therefore held that the trial court properly sustained the insurer's demurrer, but the plaintiff should have been given leave to amend. (*Id.* at p. 1072.)

show the presence of the virus — rather than public health orders or negative economic conditions overall — caused its losses. (*Id.* at p. 706.) The court explained, "The dispositive issue in this case is not whether there was COVID-19 in the hotel, or whether fomites are a form of physical damage, but instead is whether the presence of COVID-19 in or on the insured property *caused* the hotel's loss of income." (*Ibid.*) It held that the plaintiff had not created a triable issue of fact that the virus itself caused its losses: "[E]ven if [the plaintiff] had eradicated all traces of COVID-19 from its premises, it still would have suffered the same lost income." (*Id.* at p. 708.)

By contrast, *Coast Restaurant Group, Inc. v. Amguard Ins. Co.* (2023) 90 Cal.App.5th 332, 340 (*Coast Restaurant*) held that public health orders could trigger coverage in and of themselves. The orders "physically affected the property because they affected how the physical space of the property and the physical objects (chairs, tables, etc.) in that space could or could not be used," and they constituted a loss because "the governmental restrictions . . . deprived the appellant of important property rights in the covered property." (*Ibid.*) Nonetheless, despite the possibility of coverage, the court held that the plaintiff could not prevail based on specific policy exclusions for loss or damage caused by " 'enforcement of any ordinance or law' " or by " '[a]ny virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease.' " (*Id.* at pp. 343–344.)

In two later cases, the *Marina Pacific* court reaffirmed its holding that the presence of the COVID-19 virus on an insured's property may constitute direct physical loss or damage to property. (*Shusha, Inc. v. Century-National Ins. Co.* (2022) 87 Cal.App.5th 250, 264, review granted Apr. 19, 2023, S278614

(*Shusha*); see *JRK Property Holdings, Inc. v. Colony Ins. Co.* (2023) 96 Cal.App.5th 1, 4, review granted Dec. 20, 2023, S282657.) The court confirmed its view that a plaintiff "is not required to provide authority at the pleading stage to support its position that contamination with the COVID-19 virus caused damage to the surfaces in its premises." (*Shusha*, at p. 265.) Importantly, the court extended *Marina Pacific*'s interpretation of direct physical loss or damage even to policies that, unlike *Marina Pacific*, did not extend special coverage to communicable disease events. (*Id.* at pp. 265–266.) There was "a sufficient, independent basis for lost business income coverage under the policy provision for losses due 'to the necessary suspension of [the insured's] operation during the period of restoration arising from direct physical loss or damage to [covered] property.' " (*Ibid.*)

A different court likewise followed *Marina Pacific* and held that allegations of molecular interaction between the COVID-19 virus and the surfaces of insured property were sufficient to allege direct physical loss or damage. (*San Jose Sharks, LLC v. Superior Court* (2023) 98 Cal.App.5th 158, 168 (*San Jose Sharks*).) But it determined that the policy's contamination exclusion, which "unambiguously exclude[d] physical loss or damage in the form of viral contamination from the scope of coverage," largely precluded recovery. (*Id.* at p. 171.)

Reviewing a number of these decisions, the court in *Endeavor Operating Co., LLC v. HDI Global Ins. Co.* (2023) 96 Cal.App.5th 420, review granted December 13, 2023, S282533 (*Endeavor*), disagreed with *Marina Pacific* and *Shusha* that the presence of COVID-19 on an insured's property, and allegations that COVID-19 adsorbed or interacted with surfaces

of the property, were sufficient to trigger coverage. (*Id.* at pp. 441–442.) The *Endeavor* court explained, "[T]he type of viral interaction with surfaces alleged by Endeavor (and accepted as true) does not, as a matter of law, satisfy the default definition of 'direct physical harm or loss to property.' " (*Id.* at p. 442, fn. omitted.) The court further disagreed with *Coast Restaurant* that public health orders, in and of themselves, could constitute a physical loss to property. It observed, "Every other California decision has rejected that view and instead held that ' "direct physical loss or damage" ' requires 'physical alteration' of the property, such that mere loss of the property's use will generally not suffice — except when the policy explicitly includes loss of use due to a virus as qualifying for coverage." (*Id.* at p. 434.)

Still another court agreed in principle that a plaintiff "may fall within the insurance property damage coverage provisions by showing the COVID-19 virus altered its property and caused physical damage." (*Santa Ynez Band of Chumash Mission Indians v. Lexington Ins. Co.* (2023) 90 Cal.App.5th 1064, 1070, review granted July 12, 2023, S280353.) But, in the context of a motion for summary judgment, the court held that a plaintiff must show "that the virus *actually caused* physical damage *to its property*." (*Id.* at p. 1072.) "If there is alteration of property without physical damage, then there is no proof of an economic loss that can be compensated under the policy. The ordinary meaning of the term 'physical damage to property' does not include a virus on the property." (*Ibid.*) The plaintiff, which owned and operated a casino and resort, failed to make a sufficient showing of damage. (*Id.* at p. 1073.) It did not provide evidence, "for example, that its carpeting, gaming tables, gambling devices, and playing cards had to be replaced or could not be used again." (*Ibid.*) The casino and resort's "physical

building structure remained intact and was not changed. [Plaintiff's] employees worked there before, during, and after the shutdown. . . . There was no showing of the type of damage that policyholders could reasonably expect to be compensated for, such as alteration causing damage by fire, flood, or by physical impact to the property." (*Ibid.*)

Lastly, the court in *John's Grill, Inc. v. The Hartford Financial Services Group, Inc.* (2022) 86 Cal.App.5th 1195, 1211, review granted March 29, 2023, S278481, sidestepped these disputes and found coverage under a policy's "Limited Fungi or Virus Coverage Endorsement." The court interpreted the triggering language for coverage under this endorsement as "includ[ing] but . . . not restricted to 'direct' and 'physical' forms of loss or damage." (*Id.* at p. 1215.) While the policy placed certain conditions on coverage, the court found the operative paragraph "indecipherable when applied to viruses." (*Id.* at p. 1221.) These conditions rendered any coverage under the endorsement illusory, and therefore they could not be enforced. (*Id.* at p. 1224.)

## C. The Parties' Positions

As noted, the Ninth Circuit posed the following question: "Can the actual or potential presence of the COVID-19 virus on an insured's premises constitute 'direct physical loss or damage to property' for purposes of coverage under a commercial property insurance policy?" (*Another Planet*, *supra*, 56 F.4th at p. 734.) The parties, naturally, disagree about the correct answer.

Another Planet urges an answer in the affirmative. It contends the COVID-19 virus causes both direct physical damage and direct physical loss to property. It notes that the

COVID-19 virus is a physical substance, and "[l]ike any physical substance, it interacts with its environment, including the cells it infects, and the air and other matter it contaminates." (Fn. omitted.) The COVID-19 virus bonds or attaches to particles in the air and the surfaces of objects. In Another Planet's view, when the COVID-19 virus "attaches or binds to surfaces and objects, it converts those surfaces and objects to active fomites. . . . People can become infected by touching surfaces where [the COVID-19 virus] is present, then touching their eyes, nose, or mouth. The physical alteration from an object to a fomite makes physical contact with those previously safe, inert surfaces (e.g., handrails, doorknobs, bathroom fixtures) unsafe." (Fns. omitted.) Thus, according to Another Planet, the COVID-19 virus contaminates physical property and physically damages it. In addition, Another Planet argues the presence of the COVID-19 virus causes direct physical loss to property because it renders property unusable for its intended use. It relies on *Hughes*, *supra*, 199 Cal.App.2d at page 249 for the proposition that a property suffers direct physical loss when "rational persons" would not "be content" to use the property for its intended purpose, given the risk of contracting the COVID-19 illness. Another Planet criticizes *MRI Healthcare* for allegedly equating physical loss with physical damage and requiring a " 'distinct, demonstrable, physical alteration' of the property" for both. (*MRI Healthcare*, *supra*, 187 Cal.App.4th at p. 779, quoting 10A Couch on Insurance, *supra*, § 148:46.) For both physical loss and physical damage, Another Planet relies heavily on the opinion of the Supreme Court of Vermont in *Huntington Ingalls Industries, Inc. v. Ace American Ins. Co.* (Vt. 2022) 287 A.3d 515 (*Huntington Ingalls*), which held that a

plaintiff had stated a claim for insurance coverage based on the presence of the COVID-19 virus at its insured properties.

Vigilant disagrees, citing what it describes as the overwhelming majority of state and federal courts to consider the issue. It argues that "because viral particles resting on inert physical property do not cause any structural alteration to the property, the temporary presence of such particles does not qualify as 'direct physical damage or loss' to the property as a matter of law." Vigilant acknowledges that "when viral particles contaminate an inert surface . . . the surface may become a vector of transmission known as a 'fomite.' [Citation.] But when an object becomes a 'fomite,' the object itself has not physically changed in any way. The word 'fomite' is merely a label used to describe an object where viral particles rest and can be transferred to other humans who touch the object." Vigilant contends that such property is not damaged; it need not be replaced or repaired. At most, it should be cleaned, but for Vigilant such a cleaning "does not constitute a 'repair' of broken property any more than does mopping up spilled water or brushing off a dusty tabletop." Vigilant defends *MRI Healthcare* and asserts that "limitations on the use of undamaged property that remains in the insured's possession do not qualify as a 'direct physical loss.' " (Italics omitted.) In Vigilant's view, the fact that the virus's physical presence caused a loss of use is insufficient without a physical loss: "[T]he word 'physical' modifies 'loss to property,' not the *cause* of the loss." Vigilant allows that a physical force might render property "entirely 'unusable or uninhabitable' for any purpose," thus causing a physical loss, but it contends such a situation is entirely distinguishable from the "temporary presence of" the COVID-19 virus.

### D.  Principles of Interpretation

The Ninth Circuit's question and the parties' arguments require us to interpret the phrase "direct physical loss or damage to property" in the insurance policy Vigilant issued to Another Planet.  "As a question of law, the interpretation of an insurance policy is reviewed de novo under well-settled rules of contract interpretation."  (*E.M.M.I. Inc. v. Zurich American Ins. Co.* (2004) 32 Cal.4th 465, 470.)  " ' "While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply." [Citation.]  Thus, "the mutual intention of the parties at the time the contract is formed governs interpretation." [Citation.]  If possible, we infer this intent solely from the written provisions of the insurance policy.  [Citation.]  If the policy language 'is clear and explicit, it governs." ' " (*Yahoo Inc. v. National Union Fire Ins. Co.* (2022) 14 Cal.5th 58, 67 (*Yahoo*).)

" 'The "clear and explicit" meaning of these provisions, interpreted in their "ordinary and popular sense," unless "used by the parties in a technical sense or a special meaning is given to them by usage" [citation], controls judicial interpretation. [Citation.]'  [Citations.]  A policy provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable.  [Citation.]  But language in a contract must be interpreted as a whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract. [Citation.]  Courts will not strain to create an ambiguity where none exists."  (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18–19.)  "Thus, if the meaning a layperson would ascribe to contract language is not ambiguous, we apply that meaning." (*AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 822 (*AIU Insurance*).)

### E. Plain Meaning

Another Planet's insurance policy uses the phrase "direct physical loss or damage" several times, but it is not defined in the policy itself. It appears undisputed that the adjectives " 'direct' " and " 'physical' " apply to " 'damage,' " as well as " 'loss.' " (*Ward, supra*, 114 Cal.App.4th at p. 554.) It also appears undisputed that direct physical loss and direct physical damage must differ in their meaning somehow, even if they overlap. (See *Starr Surplus Lines Ins. Co. v. Eighth Judicial Dist.* (Nev. 2023) 535 P.3d 254, 262 (*Starr Surplus*) ["though the disjunctive 'or' directs that each word retains its own meaning, [citation], they are not wholly 'distinct concept[s]' "].) We therefore examine each phrase in turn.

#### 1. *Direct Physical Damage to Property*

Notwithstanding the split identified by the Ninth Circuit, and the parties' disagreement regarding the ultimate question of insurance coverage here, the available authorities in California and elsewhere reflect a substantial degree of consensus regarding the meaning of direct physical damage to property. As the *Inns-by-the-Sea* court noted, "The words in the phrase 'direct physical damage' all have commonly understood meanings. 'Physical' is defined as 'having material existence: perceptible especially through the senses and subject to the laws of nature.' [Citation.] 'Direct' is defined as 'proceeding from one point to another in time or space without deviation or interruption,' 'stemming immediately from a source,' and 'characterized by close logical, causal, or consequential relationship.' [Citation.] 'Damage' is defined as 'loss or harm resulting from injury to . . . property . . . .' " (*Inns-by-the-Sea, supra*, 71 Cal.App.5th at pp. 699–700.) Another Planet's preferred authority adopted these same definitions, even as it

found for the insured. (See *Huntington Ingalls*, *supra*, 287 A.3d at pp. 525–526.)

It is self-evident, of course, that "property insurance is insurance of *property*. While in the modern setting 'just about any type of property' may be insured, the insured item must nonetheless be property. [¶] Given this premise, the threshold requirement for recovery under a contract of property insurance is that the insured property has sustained physical loss or damage." (*Simon Marketing, Inc. v. Gulf Ins. Co.* (2007) 149 Cal.App.4th 616, 622–623 (*Simon Marketing*).) Thus, for direct physical damage to property to occur, the property itself must have been physically harmed or impaired. (See *Starr Surplus*, *supra*, 535 P.3d at p. 262 ["the plain language of 'direct physical . . . damage to covered property' requires a material or tangible harm or injury directed toward the property itself," fn. omitted].)

It is also evident, based on the plain meaning of direct physical damage, that the general requirement of a distinct, demonstrable, physical change or alteration to property applies here. As the Supreme Court of Vermont explained, "We conclude that direct physical damage requires a distinct, demonstrable, physical change to property. When we combine the definitions of 'direct,' 'physical,' and 'damage' provided above, the plain meaning is evident. The three components — immediate or proximate causation, [citation], material force or effect, [citation], and injury to property, [citation] — when logically construed together require that there be a physical alteration to the property itself for damage to occur under the policy. [Citation.] The addition of 'distinct' and 'demonstrable' to this definition is important because it 'necessarily implicates the insured's burden of showing that a covered loss has

occurred,' i.e. an articulable change to the property."
(*Huntington Ingalls*, *supra*, 287 A.3d at p. 527.)

Such a change or alteration need not be visible to the
naked eye to constitute direct physical damage to property;
"alterations at the microscopic level may meet this threshold."
(*Huntington Ingalls*, *supra*, 287 A.3d at pp. 527–528; see *Starr
Surplus*, *supra*, 535 P.3d at p. 263 ["Both physical loss and
physical damage can arise from invisible or microscopic
forces"].)  Instead, it is the *effect* of the change or alteration of
the property that is determinative.  If the change or alteration
causes harm or injury to the property itself, such a change or
alteration may constitute direct physical damage to property.
Conversely, if a change or alteration does not cause any damage
or harm to the property, it does not constitute direct physical
damage to property.  Many physical forces, such as heat and
cold, cause physical changes or alterations to property, but these
changes or alterations do not necessarily cause physical
damage.

### 2.  *Direct Physical Loss to Property*

Although the precise meaning of direct physical loss to
property is more contested, its general scope is readily
ascertainable.  Loss can simply be a more extreme form of
damage, but its meaning is also broader.  Referencing a common
dictionary definition, the *Inns-by-the-Sea* court explained,
" 'Loss' is often used to refer to 'destruction' and 'ruin' [citation],
but its definition also includes 'the partial or complete
deterioration or absence of a physical capability or function,' 'an
instance of losing someone or something,' and 'the harm or
privation resulting from losing or being separated from someone
or something.' "  (*Inns-by-the-Sea*, *supra*, 71 Cal.App.5th at

p. 705, fn. 18.) Again, the authority cited by Another Planet is generally in accord. (*Huntington Ingalls*, *supra*, 287 A.3d at p. 525.)

The pairing of the word "physical" with "loss" demonstrates " 'there must be some *physicality* to the loss . . . of property — *e.g.*, a physical alteration, physical contamination, or physical destruction.' " (*Inns-by-the-Sea*, *supra*, 71 Cal.App.5th at p. 707.) It also encompasses complete physical deprivation or dispossession, such as when property is stolen. (See *Apple Annie*, *supra*, 82 Cal.App.5th at p. 929, fn. 10.)

This physicality requirement is reinforced by the insurance policy's reference in its business income and extra expense provisions to a "period of restoration" following direct physical loss or damage, which includes "the time required to [¶] . . . [¶] repair or replace the property." This language "implies that the 'loss' or 'damage' that gives rise to Business Income coverage has a *physical* nature that can be *physically* fixed." (*Inns-by-the-Sea*, *supra*, 71 Cal.App.5th at p. 707.) "The definition of 'period of restoration' provides an indication that the phrase 'direct physical loss of' property was not intended to include the mere loss of use of physical property to generate income, without any other physical impact to property that could be repaired, rebuilt or replaced." (*Id.* at p. 708.) "The definition of 'period of restoration,' by recognizing there will be a period of physical repair to the property, is, at a minimum, consistent with requirement of a physical alteration to trigger a covered loss." (*Starlight Cinemas*, *supra*, 91 Cal.App.5th at p. 40.)

In describing this physicality requirement, the Couch treatise does not note any difference between direct physical damage and direct physical loss. It applies the same "distinct, demonstrable, physical alteration" requirement to each: "The requirement that the loss be 'physical,' given the ordinary definition of that term, is widely held to exclude alleged losses that are intangible or incorporeal and, thereby, to preclude any claim against the property insurer when the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property." (10A Couch on Insurance, *supra*, § 148:46, fns. omitted.) Another treatise echoes this description: "The requirement that the loss or damage be 'physical' therefore has been found to preclude coverage for losses that are solely intangible or incorporeal; for example, an economic loss unaccompanied by a distinct physical alteration to property." (5 New Appleman on Insurance Law Library Edition, *supra*, § 46.03[2].)

Prior to the COVID-19 pandemic, several California courts likewise adopted this description of direct physical loss to property. (See, e.g., *Doyle, supra*, 21 Cal.App.5th at p. 38; *MRI Healthcare, supra*, 187 Cal.App.4th at p. 779; *Simon Marketing, supra*, 149 Cal.App.4th at pp. 622–623.) It has also been widely adopted in cases rejecting coverage for pandemic-related losses. (See, e.g., *Endeavor, supra*, 96 Cal.App.5th at p. 440, review granted; *Starlight Cinemas, supra*, 91 Cal.App.5th at p. 38; *Inns-by-the-Sea, supra*, 71 Cal.App.5th at p. 706.) Even cases finding the possibility of coverage have assumed this description applies. (See, e.g., *San Jose Sharks, supra*, 98 Cal.App.5th at p. 168; *Shusha, supra*, 87 Cal.App.5th at p. 264, review granted; *Marina Pacific, supra*, 81 Cal.App.5th at p. 108.)

The longstanding California view that direct physical loss to property requires a distinct, demonstrable, physical alteration of property is correct. But this requirement is not as restrictive as the Couch treatise has interpreted it. The Couch treatise places its description in opposition to cases "allowing coverage based on physical damage despite the lack of physical alteration of the property" including one where "the uninhabitability of the property was due to the fact that gasoline vapors from adjacent property had infiltrated and saturated the insured building." (10A Couch on Insurance, *supra*, § 148:46, citing *Western Fire Ins. Co. v. First Presbyterian Church* (Colo. 1968) 437 P.2d 52.) But, as the *Inns-by-the-Sea* court observed, it is not self-evident that the physical alteration requirement necessarily excludes such a loss: "[I]t is possible that in the context of real property, the 'distinct, demonstrable, physical alteration' referenced in the Couch treatise [citation] could include damage that is not structural, but instead is caused by a noxious substance or odor." (*Inns-by-the-Sea*, *supra*, 71 Cal.App.5th at p. 706, fn. 19.)

*Inns-by-the-Sea* cited case law from other jurisdictions where "the presence of noxious substances and odors" was found sufficient to constitute direct physical loss or damage to property. (*Inns-by-the-Sea, supra*, 71 Cal.App.5th at p. 701.) It explained, "[C]ase law supports the view that in certain circumstances an invisible substance or biological agent might give rise to coverage because it causes a policyholder to suspend operations due to direct physical loss of or damage to property." (*Id.* at p. 710, fn. 21.)

We agree that an invisible substance or biological agent may, in some cases, be sufficiently harmful and persistent to cause a distinct, demonstrable, physical alteration to property.

As one court explained, a physical contaminant may cause direct physical loss or damage where it is "so connected to the property that the property effectively becomes the source of its own loss or damage." (*Starr Surplus*, *supra*, 535 P.3d at p. 265; see *United Talent*, *supra*, 77 Cal.App.5th at p. 833 [risk of harm "inextricably linked to the insured property"].) Notably, such a connection will not be found where the substance or biological agent can be easily cleaned or removed from the property. (*Inns-by-the-Sea*, *supra*, 71 Cal.App.5th at p. 703, fn. 17.) "While saturation, ingraining, or infiltration of a substance into the materials of a building or persistent pollution of a premises requiring active remediation efforts is sufficient to constitute 'direct physical loss of or damage to property,' evanescent presence is not." (*Verveine Corp. v. Strathmore Ins. Co.* (Mass. 2022) 184 N.E.3d 1266, 1276 (*Verveine*).)

Given this physicality requirement, Another Planet is incorrect that direct physical loss to property may be found anytime a property may not be used as intended. A property insurance policy does not cover a particular intended use; it covers the property itself. (See *Simon Marketing*, *supra*, 149 Cal.App.4th at pp. 622–623.) "In simple terms, under this rule, ' "Plaintiff[s'] operations are not what is insured — the building and the personal property in or on the building are." ' " (*Inns-by-the-Sea*, *supra*, 71 Cal.App.5th at p. 706.) The property itself must suffer a direct physical loss, i.e., it must be so negatively affected that it is rendered effectively unusable or uninhabitable.

Another Planet relies on *Hughes*, *supra*, 199 Cal.App.2d 239, but *Hughes* does not support Another Planet's broad interpretation of direct physical loss. The primary issue in *Hughes* was whether the terms " 'dwelling' " or " 'dwelling

building' " included the soil underneath the insured's home. (*Id.* at p. 248.) The *Hughes* court concluded the soil was included, because "to exclude the underlying land would be to render the policy illusory." (*Ibid.*) Among other things, the court reasoned that coverage must exist where the home was "rendered completely useless to its owners," even if no "tangible injury to the physical structure itself could be detected." (*Ibid.*) The home "suffered real and severe damage when the soil beneath it slid away and left it overhanging a 30-foot cliff. Until such damage was repaired and the land beneath the building stabilized, the structure could scarcely be considered a 'dwelling building' in the sense that rational persons would be content to reside there." (*Id.* at p. 249.) While we need not address the specific question before the *Hughes* court, it does not support Another Planet's view that direct physical loss encompasses any loss of intended use. The loss in *Hughes* was plainly more severe than simply a change in use; the insureds were effectively deprived or dispossessed of their property. (See *Endeavor*, *supra*, 96 Cal.App.5th at p. 435, review granted ["*Hughes* did not purport . . . to erect a ubiquitous 'loss of use equals property loss or damage' rule"].)

Finally, the requirement of a direct physical loss to property generally excludes impairments that are purely legal in nature. (See *Garvey*, *supra*, 48 Cal.3d at p. 406 [referring to " 'fortuitous, active, physical forces such as lightning, wind, and explosion, which bring about the loss' "].) It does not cover situations where there is "a loss of use of property but there is no direct physical loss because a government order as opposed to a physical condition related to the property caused the deprivation." (*Huntington Ingalls*, *supra*, 287 A.3d at p. 531.) This position enjoys near-universal support among the Courts

of Appeal: "[M]ost California appellate courts have held the allegation of temporary loss of use of property resulting from pandemic-related government closure orders — without any physical loss of the property — is not sufficient to support a claim against an insurer for business income coverage under a policy that requires the suspension be caused by 'direct physical loss of or damage to' insured property." (*Starlight Cinemas*, *supra*, 91 Cal.App.5th at p. 38; accord, *Endeavor*, *supra*, 96 Cal.App.5th at p. 434, review granted [collecting cases].)

*Coast Restaurant* departed from this consensus. It held, "[W]hile physical alteration to covered property could trigger coverage under a 'physical loss or damage' insuring provision, that is not the only possible trigger for coverage." (*Coast Restaurant*, *supra*, 90 Cal.App.5th at p. 343.) Specifically, the *Coast Restaurant* court believed pandemic-related public health orders could cause direct physical loss to property because they "affected how the physical space of the property and the physical objects (chairs, tables, etc.) in that space could or could not be used" and "deprived the [insured] of important property rights in the covered property." (*Id.* at p. 340.)

Neither scenario identified by *Coast Restaurant* falls within the definition of direct physical loss to property. Both reflect changes in the insured's use of or rights to the property, not changes to the physical condition of the property itself. (See *Endeavor*, *supra*, 96 Cal.App.5th at pp. 434–435, review granted; *Starlight Cinemas*, *supra*, 91 Cal.App.5th at p. 38 ["We disagree with our colleagues in *Coast* . . . that a temporary deprivation of an insured's right to use covered property constitutes a covered loss under policy language covering a 'direct physical loss of or damage to property' "].) Although an insured may choose to make physical changes to the condition

of the property in response to a government order, the government order itself has only intangible or incorporeal effects — *uses* and *rights* — not physical ones. "[D]eprivation of property must be causally linked to a physical event. The plain meaning of 'direct physical loss' requires an 'explicit nexus between the purported loss and the physical condition of the insured property.' " (*Huntington Ingalls*, *supra*, 287 A.3d at p. 531.) Where the deprivation of property is caused by a government order, rather than a physical event, no direct physical loss to property has occurred.[4]

### 3. *"Property Damage" in Commercial General Liability Policies*

Another Planet urges a more expansive interpretation of direct physical loss or damage to property, based in part on the definition of "property damage" contained in its commercial general liability (CGL) insurance policy. Another Planet obtained its CGL policy from Vigilant as well, and it appears as a separate section in a single insurance policy packet. Under the CGL policy, Vigilant agreed to pay "damages that the insured becomes legally obligated to pay by reason of liability: [¶] imposed by law; or [¶] assumed in an insured contract; [¶] for bodily injury or property damage caused by an occurrence to which this coverage applies." (Boldface omitted.) The CGL

---

[4] We disapprove *Coast Restaurant Group, Inc. v. Amguard Ins. Co.*, *supra*, 90 Cal.App.5th 332, to the extent it holds that pandemic-related government health orders regulating the use of property may cause direct physical loss to property. We need not express any view regarding the separate question of whether or under what circumstances a governmental *seizure* of real or personal property would constitute a direct physical loss to property. (Cf. *American Alternative Ins. Corp. v. Superior Court* (2006) 135 Cal.App.4th 1239, 1246.)

policy defined property damage as (1) "physical injury to tangible property, including resulting loss of use of that property" and (2) "loss of use of tangible property that is not physically injured."

Another Planet is correct that this definition in its CGL policy may be relevant to the interpretation of direct physical loss or damage in its property insurance policy, whether the two policies are considered a single contract (see Civ. Code, § 1641 ["The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other"]) or not (see *id.*, § 1642 ["Several contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together"]). But, for two primary reasons, we conclude that this CGL definition does not expand the definition of direct physical loss or damage to property described above.

First, the nature of third party CGL insurance is materially different from first party property insurance. "[A] first party insurance policy provides coverage for loss or damage sustained directly by the insured (e.g., life, disability, health, fire, theft and casualty insurance). A third party liability policy, in contrast, provides coverage for liability of the insured to a 'third party' (e.g., a CGL policy, a directors and officers liability policy, or an errors and omissions policy). In the usual first party policy, the insurer promises to pay money to the insured upon the happening of an event, the risk of which has been insured against. In the typical third party liability policy, the carrier assumes a contractual duty to pay judgments the insured becomes legally obligated to pay as damages because of bodily injury or property damage caused by the insured." (*Montrose Chemical Corp. v. Admiral Ins. Co.* (1995) 10 Cal.4th

645, 663 (*Montrose*).)  Third party coverage therefore turns on the insured's legal liability, rather than the fact of injury to property itself.

Second, and relatedly, the scope of coverage in a standard third party CGL policy is materially different from the scope of standard first party property coverage at issue here.  Although the two types of coverage are often combined in a single insurance package, "[t]he scope of coverage and the operation of the exclusion clauses . . . are different in the separate policy portions and should be treated as such." (*Garvey*, *supra*, 48 Cal.3d at p. 406.)  " 'Liability and corresponding coverage under a third party insurance policy must be carefully distinguished from the coverage analysis applied in a first party property contract.  Property insurance, unlike liability insurance, is unconcerned with establishing negligence or otherwise assessing tort liability.' " (*Ibid.*)

Moreover, a reasonable person would readily understand that property damage in Another Planet's CGL policy is more expansive in scope than direct physical loss or damage to property in its property insurance policy.  The first prong of the CGL property damage definition covers "physical injury to tangible property," which is analogous to the ordinary understanding of direct physical damage to property.  The second prong of the CGL property damage definition covers "loss of use of tangible property that is not physically injured," but it does not contain the limiting adjectives "direct" or "physical" in direct physical loss to property.  Because the definition of property damage in Another Planet's CGL policy is materially different, on its face, from the terms used in its property

insurance policy, the former carries little weight in interpreting the latter.[5]

## F. Ambiguity and Extrinsic Evidence

Another Planet also urges an expansive definition of direct physical loss or damage based on what it characterizes as extrinsic evidence of a latent ambiguity in the meaning of the policy language, as applied to its specific allegations of insurance coverage for COVID-19-related losses. We conclude that the evidence proffered by Another Planet is not inconsistent with the plain meaning of direct physical loss or damage described above, and it does not reveal any ambiguity in the policy language.

"As California courts previously have observed, the 'meaning of language is to be found in its applications. An

---

[5] For similar reasons, the specific virus exclusion in Another Planet's CGL policy sheds little light on the meaning of direct physical damage or loss to property in Another Planet's property insurance policy. The exclusion states, in part, "[T]his insurance does not apply to any damages, loss, cost or expense arising out of the actual, alleged or threatened contaminative, pathogenic, toxic or other hazardous properties of biological agents." (Boldface omitted.) The phrase "biological agents" includes "viruses or other pathogens." Because the grant of coverage in Another Planet's CGL policy is different from the grant of coverage in its property insurance policy, the fact that certain losses are excluded from the former does not mean they are covered by the latter. Moreover, to the extent Another Planet's point is that the virus exclusion shows that " 'all risks' insurance include[s] coverage for losses caused by a virus" like COVID-19, that point is not inconsistent with our interpretation of direct physical loss or damage to property. As discussed further in the next section, nothing in that interpretation categorically excludes a virus as a potential cause of direct physical loss or damage to property.

indeterminacy in the application of language signals its vagueness or ambiguity. An ambiguity arises when language is reasonably susceptible of more than one application to material facts. There cannot be an ambiguity per se, i.e., an ambiguity unrelated to an application.' [Citations.] [¶] Accordingly, '[e]ven if a contract appears unambiguous on its face, a latent ambiguity may be exposed by extrinsic evidence which reveals more than one possible meaning to which the language of the contract is yet reasonably susceptible.' [Citation.] 'The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible.' " (*Dore v. Arnold Worldwide, Inc.* (2006) 39 Cal.4th 384, 391.) A court may provisionally receive such evidence until it is "in a position to determine whether in the light of all of the offered evidence, the item objected to will turn out to be admissible as tending to prove a meaning of which the language of the instrument is reasonably susceptible or inadmissible as tending to prove a meaning of which the language is not reasonably susceptible." (*Pacific Gas & E. Co. v. G.W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 40, fn. 7 (*Pacific Gas*).) In this case, Another Planet has cited or requested judicial notice of certain extrinsic evidence it contends is relevant to the interpretation of its insurance policy.

First, Another Planet relies on a 2006 circular issued by the Insurance Services Office, Inc. (ISO) announcing a new standard exclusion for "loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease."

The ISO is "an organization that develops standard policy forms for the insurance industry and collects statistical data and estimates risks relevant to the forms." (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1262.) It also "publishes circulars designed to explain the intent, purpose and effect of its standard form provisions." (*Maryland Casualty Co. v. Reeder* (1990) 221 Cal.App.3d 961, 971.)

This ISO circular stated, "Disease-causing agents may render a product impure (change its quality or substance), or enable the spread of disease by their presence on interior building surfaces or the surfaces of personal property. When disease-causing viral or bacterial contamination occurs, potential claims involve the cost of replacement of property (for example, the milk), cost of decontamination (for example, interior building surfaces), and business interruption (time element) losses." The circular offered examples such as "the growth of listeria bacteria in milk" and "viral and bacterial contaminants [including] rotavirus, SARS, influenza (such as avian flu), legionella and anthrax."

Under the heading, "Current Concerns," the circular provided the following explanation for the new virus exclusion: "Although building and personal property could arguably become contaminated (often temporarily) by such viruses and bacteria, the nature of the property itself would have a bearing on whether there is actual property damage. An allegation of property damage may be a point of disagreement in a particular case. In addition, pollution exclusions are at times narrowly applied by certain courts. In recent years, ISO has filed exclusions to address specific exposures relating to contaminating or harmful substances. Examples are the mold exclusion in property and liability policies and the liability

47

exclusion addressing silica dust. Such exclusions enable elaboration of the specific exposure and thereby can reduce the likelihood of claim disputes and litigation."

The circular continued, "While property policies have not been a source of recovery for losses involving contamination by disease-causing agents, the specter of pandemic or hitherto unorthodox transmission of infectious material raises the concern that insurers employing such policies may face claims in which there are efforts to expand coverage and to create sources of recovery for such losses, contrary to policy intent. [¶] In light of these concerns, we are presenting an exclusion relating to contamination by disease-causing viruses or bacteria or other disease-causing microorganisms."

We have recognized that standardized insurance industry provisions and their accompanying interpretative materials may be useful in analyzing coverage issues. (*Montrose*, *supra*, 10 Cal.4th at p. 670.) This general rule extends to standard form exclusions. But, as with any extrinsic evidence, such exclusions are only relevant to the extent they tend to prove a meaning of which the language of the policy is reasonably susceptible. (*Pacific Gas*, *supra*, 69 Cal.2d at p. 40, fn. 7.) If a grant of coverage cannot reasonably be read to include a matter, even considering the absence of the proffered exclusion, the language of the exclusion cannot create coverage where none exists. (*Yahoo*, *supra*, 14 Cal.5th at p. 72.)

Another Planet maintains the existence of the standard exclusion covering viruses "is evidence that insurers like Vigilant knew that viruses can, and do, cause 'direct physical loss or damage to property.' " But Vigilant does not contend that viruses can *never* cause direct physical loss or damage to

property. It explicitly accepts the view of the Massachusetts Supreme Judicial Court that "the exclusion would have independent significance where, for example, personal property, such as food, becomes physically contaminated or infected with a virus, requiring its destruction or some form of remediation." (*Verveine*, *supra*, 184 N.E.3d at p. 1278.) Crucially, as the ISO circular explains, "the nature of the property itself would have a bearing on whether there is actual property damage," and it is self-evident that the nature of the virus (or other contaminant) is relevant to the existence of direct physical loss or damage as well. The dispute here revolves around the ability of the COVID-19 virus to cause direct physical loss or damage to Another Planet's property, not the ability of *any* virus to cause such loss or damage to *any* property. The virus exclusion does not provide any relevant guidance on the specific issue of the COVID-19 virus's effect on Another Planet's property.

Another Planet also relies on statements from an insurance industry group and Vigilant's parent company, Chubb Limited, that acknowledge substantial exposure to losses from natural disasters, including pandemics. For example, in its 2019 annual report, Chubb stated, "We have substantial exposure to losses resulting from natural disasters, man-made catastrophes such as terrorism or cyberattack, and other catastrophic events, including pandemics. This could impact a variety of our businesses, including our commercial and personal lines, and life and accident and health (A&H) products." These generalized statements about the effect of a pandemic on the finances of a diversified insurance company, or the insurance industry as a whole, do not shed light on the meaning of direct physical loss or damage to property in Another Planet's property insurance policy. The statements are

untethered from the policy language, and even from property insurance itself. The modern insurance industry includes many different insurance products, from life insurance and health insurance to liability insurance. Even property insurance includes many specialized policies and coverage extensions. For example, although we need not consider it here, one available extension covers " 'direct physical loss or damage to Property Insured caused by or resulting from a covered communicable disease event.' " (*Amy's Kitchen, supra,* 83 Cal.App.5th at p. 1068, boldface omitted; see fn. 3, *ante*.) A " 'communicable disease event' " is defined as " 'an event in which a public health authority has ordered that a location be evacuated, decontaminated, or disinfected due to the outbreak of a communicable disease at such location.' " (*Amy's Kitchen*, at p. 1071.) This coverage extension is not part of Another Planet's insurance policy, and it illustrates the incongruity of relying on general industry statements to inform the scope of coverage here.

Another Planet's reliance on statements by Chubb executives after the onset of the COVID-19 pandemic is similarly unpersuasive. In its 2020 annual report, Chubb discussed how the COVID-19 pandemic had affected its business: "Our and the industry's COVID-related claims come from a broad range of exposures, principally in four areas. The first occurred as people suffered from ill health or death, from front-line workers to ordinary employees, affecting everything from life and health insurance to workers compensation. The second source of exposures come from liability-related insurance, including employment practices, directors and officers (D&O) and medical malpractice. Next are business interruption losses, from businesses that had coverage and were

shut down during the pandemic. And finally, there are credit-related exposures, such as surety and trade credit." This passage illustrates the variety of Chubb's insurance products, beyond property insurance. Another Planet points out that Chubb acknowledges "business interruption losses, from businesses that had coverage and were shut down during the pandemic," but this statement expressly refers to businesses "that had coverage." It does not mandate coverage where none exists. Indeed, the same document reflects explicit hostility toward claims like those asserted by Another Planet here. In Chubb's view, the COVID-19 pandemic led to "a spree of litigation that attempts to twist the intent of contracts and reinterpret insurance contract language to force pay-outs in situations that in most cases insurers never intended to cover, and in which no premium was charged for the risk, specifically when city and state governments mandated pandemic-related business closures. This litigation relied on implausible arguments that COVID causes direct physical loss or damage to a business's property, in the same way as a fire." These statements do not support an understanding of direct physical damage or direct physical loss that differs from the plain meaning of those phrases. Another Planet has not established any ambiguity in the policy language.[6]

---

[6]     Because the policy language is not ambiguous, its plain meaning governs. (*AIU Insurance, supra*, 51 Cal.3d at p. 822.) We therefore have no occasion to apply the familiar rule that ambiguous language in an insurance policy should be interpreted to protect the insured's objectively reasonable expectations. (See *Yahoo, supra*, 14 Cal.5th at pp. 71–72.) Another Planet has not identified any meaning, other than plain meaning, to which the policy language is reasonably susceptible.

### G. The Actual or Potential Presence of the COVID-19 Virus

The Ninth Circuit asked, "Can the actual or potential presence of the COVID-19 virus on an insured's premises constitute 'direct physical loss or damage to property' for purposes of coverage under a commercial property insurance policy?" (*Another Planet*, *supra*, 56 F.4th at p. 734.) As noted, while we cannot and do not decide whether the COVID-19 virus can *ever* constitute direct physical loss or damage to property, we conclude Another Planet's allegations are insufficient to meet the definition of direct physical loss or damage to property under California law. Moreover, Another Planet's allegations regarding the COVID-19 virus and its effects appear typical of the allegations offered by many insureds in similar situations. To the extent the Ninth Circuit's question is premised on the split in authority represented on one side by *United Talent*, which held that the actual or potential presence of the virus generally could not cause direct physical loss or damage to property, and on the other by *Marina Pacific*, which held that it could, we further conclude that *United Talent* was correct.[7]

Another Planet primarily contends that the COVID-19 virus causes direct physical damage to property by physically altering surfaces where it lands and attaches. Similarly, the *Marina Pacific* court found persuasive, in part, an allegation

---

[7] Although this proceeding concerns litigation in the federal courts, we need not consider any differences between federal and California pleading standards because we conclude Another Planet's allegations are insufficient even under the more permissive California standard. (Cf. *Marina Pacific*, *supra*, 81 Cal.App.5th at pp. 109–110; *Endeavor*, *supra*, 96 Cal.App.5th at p. 442 & fn. 18, review granted.)

that the COVID-19 virus "not only lives on surfaces but also bonds to surfaces through physicochemical reactions involving cells and surface proteins, which transform the physical condition of the property." (*Marina Pacific*, *supra*, 81 Cal.App.5th at p. 108.) These allegations do not explain how the property was damaged or harmed by the presence of the COVID-19 virus. In other words, they do not allege any injury or impairment to property caused by the COVID-19 virus. The mere fact of microscopic bonds between the virus and a surface says little about the effect of such microscopic bonds on that surface. (See *Endeavor*, *supra*, 96 Cal.App.5th at p. 442, review granted ["the type of viral interaction with surfaces alleged by [the insured] (and accepted as true) does not, as a matter of law, satisfy the default definition of 'direct physical harm or loss to property' "], fn. omitted.) To constitute direct physical damage to property under California law, a tangible alteration of the property is *necessary* but not *sufficient*. An insured must allege, and later prove, that the alteration caused physical harm to the property. The alteration itself is not enough.

*Marina Pacific* also found persuasive, in part, an allegation that the COVID-19 virus "alters ordinary physical surfaces transforming them into fomites through physicochemical processes, making them dangerous and unusable for their intended purposes unless decontaminated." (*Marina Pacific*, *supra*, 81 Cal.App.5th at p. 110.) Another Planet similarly contends that the COVID-19 virus causes a "physical alteration from an object to a fomite [which] makes physical contact with those previously safe, inert surfaces (e.g., handrails, doorknobs, bathroom fixtures) unsafe" because a person could contract COVID-19 through contact with the object. Accepting these statements as true, they likewise do not

sufficiently allege direct physical damage to property. As noted, a fomite is " 'an object . . . that may be contaminated with infectious agents (such as bacteria or viruses) and serve in their transmission.' " (*United Talent*, *supra*, 77 Cal.App.5th at p. 826, fn. 5.) Describing an object as a fomite primarily reflects a conceptual or analytical change, not a physical one. And, to the extent the change is physical, it fails to satisfy the definition of direct physical damage to property for the same reason that other allegations of microscopic bonding or adhesion is insufficient. It does not involve damage or harm to *property*. "Fomite-based transmission . . . typifies another way the virus 'pos[es] health risk to humans,' as opposed to property. [Citation.] Though this evidence shows that the COVID-19 virus is 'harmful,' it simply does not equate to evidence that any property suffered physical harm." (*Starr Surplus*, *supra*, 535 P.3d at pp. 264–265.)

To support its allegation of direct physical loss to property, Another Planet alleges that the actual or potential presence of the COVID-19 virus rendered its property unusable for its intended purpose. As noted, such a bare allegation is insufficient. A property insurance policy does not cover a particular intended use; it covers the property itself. (See *Simon Marketing*, *supra*, 149 Cal.App.4th at pp. 622–623.)

Moreover, to the extent Another Planet claims it was the physical presence of the virus that caused its property to become unusable, it has failed to allege that the virus caused a distinct, demonstrable, physical alteration to property. Where a substance is alleged to cause harm to humans, rather than property, it must still alter the property itself in a lasting and persistent manner. Although Another Planet contests just how easily the COVID-19 virus may be cleaned from various

surfaces, it does not make any allegations regarding the remediation necessary to remove the virus. Instead, it focuses on the difficulty of preventing reintroduction of the virus when humans reenter and circulate through a property. But persistence in this context requires the property itself to become the source of harm. (*Starr Surplus*, *supra*, 535 P.3d at p. 265 ["[E]ven when the force does not originate within the property, it [is] so connected to the property that the property effectively becomes the source of its own loss or damage"]; see *United Talent*, *supra*, 77 Cal.App.5th at p. 833 [risk of harm "inextricably linked to the insured property"].) The risk of harm from reintroduction of the virus is essentially the opposite. The continuing nature of the risk stems not from the property but from the presence of other humans. The risk is "untethered to any property" and "may be reduced or rendered less harmful through practices unrelated to the property, such as social distancing, vaccination, and the use of masks." (*United Talent*, at p. 838; see *id.* at p. 839 [plaintiff "has not alleged that its properties required unique abatement efforts to eradicate the virus"].) As one court explained, "This is why the presence of SARS-CoV-2 is *unlike* the presence of other substances — such as unpleasant odors, dangerous chemical contamination, or asbestos — that permeate the property and require substantial effort to remove." (*Endeavor, supra*, 96 Cal.App.5th at p. 441, review granted.)[8]

---

[8] Another Planet also alleges that the COVID-19 virus damages air by changing its composition and rendering it harmful to humans. But it acknowledges in its briefing that an insured does not own *air*, in the sense of the physical particles that happen to fill an interior space or settle above an exterior

Some courts have found persuasive the fact that businesses were required to alter their physical space in order to minimize virus transmission and safely operate. (See, e.g., *Shusha, supra,* 87 Cal.App.5th at p. 264, review granted [" 'Cleaning of surfaces alone is insufficient,' and safe operations would require 'substantial physical alterations, systems changes to facilities, and new protocols for air circulation, disinfection, and disease prevention' "].) But such alterations are neither caused directly by the presence of the virus itself nor do they remedy its physical effects on property. Instead, they are preventative; "they aim to redress the way people pose harm to one another by carrying and transmitting the virus at the property." (*Starr Surplus, supra,* 535 P.3d at p. 265; see *Connecticut Dermatology Group, PC v. Twin City Fire Ins. Co.* (Conn. 2023) 288 A.3d 187, 201 ["plaintiffs' activities designed to prevent the transmission of the coronavirus on the properties were not 'repairs' in any ordinary sense of the word"].) While Another Planet contends such preventative measures are covered by its insurance policy as efforts at mitigation, such mitigation efforts are not reimbursable without an underlying covered loss or damage to property. As discussed, Another Planet has not alleged any such loss or damage.[9]

---

property. In any event, Another Planet's allegations are insufficient to show direct physical loss or damage to air for the reasons we have discussed. (See *Tapestry, Inc. v. Factory Mutual Ins. Co.* (Md. 2022) 286 A.3d 1044, 1059–1060.)

[9] We disapprove *San Jose Sharks, LLC v. Superior Court, supra,* 98 Cal.App.5th 158; *JRK Property Holdings, Inc. v. Colony Ins. Co., supra,* 96 Cal.App.5th 1, review granted; *Shusha, Inc. v. Century-National Ins. Co., supra,*

Finally, we observe that our consideration of this matter has been framed by the Ninth Circuit's certified question. Other issues, in this case or in others, may be dispositive. For example, the federal district court in this matter appears to have based its dismissal order, at least in part, on the absence of causation in light of governmental orders requiring the closure of Another Planet's venues. It wrote, "Another Planet does not have a claim for loss of business income because the closure orders [by state and local public health authorities] — and not [the] virus's alleged presence at Another Planet's facilities — caused it to shut down." The *Inns-by-the-Sea* court emphasized a similar lack of causation: "Moreover, [plaintiff] alleges that it ceased operations 'as a direct and proximate result of the Closure Orders.' It does not make the proximate cause allegation based on the particular presence of the virus on its premises." (*Inns-by-the-Sea*, *supra*, 71 Cal.App.5th at p. 703.) In *Best Rest*, the same court extended its causation analysis beyond closure orders. The plaintiff in that case, a hotel, was able to operate during the pandemic. (*Best Rest*, *supra*, 88 Cal.App.5th at p. 700.) But it " 'experienced a wave of reservation cancellations,' " and its occupancy during the pandemic was far below normal. (*Ibid*.) Although the plaintiff's business losses were related to the pandemic overall, the *Best Rest* court affirmed an adverse summary judgment order on the grounds that plaintiff's losses were not caused by the presence of the COVID-19 virus at its property. (*Id*. at p. 706.) Instead, the losses were caused by an overall reduction in the number of

_____

87 Cal.App.5th 250, review granted; and *Marina Pacific Hotel & Suites, LLC v. Fireman's Fund Ins. Co.*, *supra*, 81 Cal.App.5th 96, to the extent they are inconsistent with this opinion.

people travelling. The court concluded, "[E]ven if Best Rest had eradicated all traces of COVID-19 from its premises, it still would have suffered the same lost income." (*Id*. at p. 708.) While we need not consider these issues here, we emphasize that the focus of our opinion should not be interpreted to downplay other circumstances that might be dispositive in this case or others.

### III. CONCLUSION

For the reasons stated, we answer the Ninth Circuit's question as follows: No, the actual or potential presence of the COVID-19 virus on an insured's premises generally does not constitute "direct physical loss or damage to property" for purposes of coverage under a commercial property insurance policy.

**GUERRERO, C. J.**

**We Concur:**

**CORRIGAN, J.**
**LIU, J.**
**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.**
**EVANS, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  Another Planet Entertainment, LLC v. Vigilant Insurance Company

_____

**Procedural Posture** (see XX below)
**Original Appeal**
**Original Proceeding**  XX on request by 9th Circuit (Cal. Rules of Court, rule 8.548)
**Review Granted (published)**
**Review Granted (unpublished)**
**Rehearing Granted**

_____

**Opinion No.** S277893
**Date Filed:**  May 23, 2024

_____

**Court:**
**County:**
**Judge:**

_____

**Counsel:**

Pasich, Kirk Pasich, Nathan M. Davis, Arianna M. Young and Kayla M. Robinson for Plaintiff and Appellant.

Hunton Andrews Kurth, Scott P. DeVries, Yosef Y. Itkin, Lorelie S. Masters and Michael S. Levine for United Policyholders as Amicus Curiae on behalf of Plaintiff and Appellant.

Covington & Burling, Sabrina T. McGraw and Rani Gupta for Major League Baseball and National Hockey League as Amici Curiae on behalf of Plaintiff and Appellant.

Covington & Burling, Thomas Martecchini, David B. Goodwin, Christine S. Haskett and Billie T. H. Mandelbaum for Ross Stores, Inc., as Amicus Curiae on behalf of Plaintiff and Appellant.

Reed Smith, John N. Ellison, Richard P. Lewis, Jr., Katherine J. Ellena and Kathryn M. Bayes for California Pizza Kitchen, Inc., French Laundry Partners, LP, KRM, Inc., and Yountville Food Emporium, LLC, as Amici Curiae on behalf of Plaintiff and Appellant.

Latham & Watkins, Brook B. Roberts, John M. Wilson and Corey D. McGehee for San Manuel Band of Mission Indians and San Manuel Entertainment Authority as Amici Curiae on behalf of Plaintiff and Appellant.

Roxborough, Pomerance, Nye & Adreani, Nicholas P. Roxborough, Vincent S. Gannuscio and Joseph C. Gjonola for the Santa Ynez Band of Chumash Mission Indians of the Santa Ynez Reservation of California as Amicus Curiae on behalf of Plaintiff and Appellant.

Clyde & Co US, Susan Koehler Sullivan, Douglas J. Collodel, Gretchen S. Carner, Brett C. Safford; O'Melveny & Myers, Jonathan D. Hacker and Jenya Godina for Defendant and Respondent.

Pacific Law Partners, Clarke B. Holland, David B.A. Demo and Andrew P. Collier for Oregon Mutual Insurance Company as Amicus Curiae on behalf of Defendant and Respondent.

Crowell & Moring and Mark D. Plevin for American Property Casualty Insurance Association and National Association of Mutual Insurance Companies as Amici Curiae on behalf of Defendant and Respondent.

Lewis Brisbois Bisgaard & Smith, Raul L. Martinez and Elise D. Klein for California Fair Plan Association as Amicus Curiae on behalf of Defendant and Respondent.

Jamie Ostroff and Shari Covington for California Medical Association as Amicus Curiae.

Proskauer Rose, Kyle A. Casazza and Christina H. Kroll for The Los Angeles Lakers, Inc., as Amicus Curiae.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Kirk Pasich
Pasich LLP
10880 Wilshire Boulevard, Suite 2000
Los Angeles, CA 90024
(424) 313-7860

Jonathan D. Hacker
O'Melveny & Myers LLP
1625 I Street NW
Washington, DC 20006
(202) 383-5285